# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Fort Des Moines Church of Christ, a nonprofit religious corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:16-cv-00403-SMR-CFB |
| v. | ) ) ) | |
| Angela Jackson, Patricia Lipski, Mathew Hosford, Tom Conley, Douglas Oelschlaeger, Lily Lijun Hou, and Lawrence Cunningham, each in his or her official capacity as Commissioners of the Iowa Civil Rights Commission; Kristen H. Johnson, in her official capacity as the Executive Director of the Iowa Civil Rights Commission; Tom Miller, in his capacity as the Attorney General of the state of Iowa; and the City of Des Moines, Iowa, | ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**Oral Argument Requested** |
| Defendants. | ) ) ) ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 3

ARGUMENT ..................................................................................................... 6

I.      The Church Will Likely Succeed in Showing that the Act and City Code Violate
        the First and Fourteenth Amendments. ................................................................. 7

        A.      The facility-use mandate violates the Church's constitutional right to
                determine its religious beliefs about human sexuality, teach those beliefs
                to its members and to the public, and control its facility in a manner that is
                consistent with its religious beliefs without government interference .................. 7

        B.      The speech ban violates the Church's right to communicate its doctrine
                and control its facility use. ................................................................................. 12

                1.      The speech ban regulates constitutionally-protected
                        religious speech. ........................................................................... 12

                2.      The speech ban is content and viewpoint based. ...................... 13

                3.      The speech ban fails strict scrutiny. .......................................... 13

        C.      The religious institution exemption and speech ban are unconstitutionally
                vague in violation of the Fourteenth Amendment. ............................................... 15

        D.      The speech ban is unconstitutionally overbroad in violation of the First
                Amendment. .......................................................................................................... 18

II.     The Church is Suffering Irreparable Harm. ..................................................... 19

III.    The Balance of Hardships Favors the Church. ................................................. 20

IV.     Public Policy Favors a Preliminary Injunction For the Church. ....................... 20

CONCLUSION ..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases:**

*American Civil Liberties Union v. Ashcroft,*
  322 F.3d 240 (3d Cir. 2003)...........................................................................................20

*Armstrong v. District of Columbia Public Library,*
  154 F.Supp.2d 67 (D.D.C. 2001) ...................................................................................19

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002)........................................................................................................18

*Bryce v. Episcopal Church in the Diocese of Colorado,*
  289 F.3d 648 (10th Cir. 2002) .........................................................................................8

*Capitol Square Review & Advisory Board v. Pinette,*
  515 U.S. 753 (1995)........................................................................................................12

*Child Evangelism Fellowship of Minnesota v. Minneapolis Special School District No. 1,*
  690 F.3d 996 (8th Cir. 2012) ............................................................................................7

*City of Chicago v. Morales,*
  527 U.S. 41 (1999)..........................................................................................................15

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos,*
  483 U.S. 327 (1987)...................................................................................................10, 11

*Elrod v. Burns,*
  427 U.S. 347 (1976)........................................................................................................19

*Foti v. City of Menlo Park,*
  146 F.3d 629 (9th Cir. 1998) ..........................................................................................15

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972)........................................................................................................15

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
  132 S.Ct. 694 (2012) ...........................................................................................8, 9, 11, 12

*Kedroff v. Saint Nicholas Cathedral*,
    344 U.S. 94 (1952)..................................................................................8, 9, 10

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)............................................................................................18

*Menorah Chapels at Millburn v. Needle*,
    899 A.2d 316 (N.J. 2006)..............................................................................8, 9

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) ....................................................................19, 20

*Phelps-Roper v. City of Manchester, Missouri*,
    697 F.3d 678 (8th Cir. 2012) ............................................................................18

*Powell v. Noble*,
    798 F.3d 690 (8th Cir. 2015) ............................................................................19

*Rayburn v. General Conference of Seventh-Day Adventist*,
    772 F.2d 1164 (4th Cir. 1985) ............................................................................8

*Reed v. Town of Gilbert, Arizona*,
    135 S.Ct. 2218 (2015)..................................................................................13, 14

*Rent-A-Center, Inc. v. Iowa Civil Rights Commission*,
    843 N.W.2d 7272 (Iowa 2014) ............................................................................5

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995)............................................................................................13

*Saxe v. State College Area School District*,
    240 F.3d 200 (3d Cir. 2001)..............................................................................19

*Texas v. Johnson*,
    491 U.S. 397 (1989)............................................................................................14

*United States v. Williams*,
    553 U.S. 285 (2008)....................................................................................16, 17

*Video Software Dealers Association v. Webster*,
    968 F.2d 684 (8th Cir. 1992) ........................................................................15

*Woodis v. Westark Community College*,
    160 F.3d 435 (8th Cir. 1998) ......................................................................15

**Statutes:**

Iowa Code § 216.1 .........................................................................................1, 5

Iowa Code § 216.2 ...............................................................................4, 5, 7, 10

Iowa Code § 216.5 ..............................................................................................5

Iowa Code § 216.7 ...........................................................1, 2, 4, 5, 7, 13, 16, 17

Des Moines City Code § 62-1..........................................................................4, 5

Des Moines City Code § 62-8...............................................................................5

Des Moines City Code § 62-42.............................................................................5

Des Moines City Code § 62-136.......................................................................2, 4

Des Moines City Code § 62-137...........................................................................5

**Other Authorities:**

Sexual Orientation & Gender Identity:  A Public Accommodations Provider's Guide to Iowa
Law ....................................................................................................1, 2, 5, 16

## INTRODUCTION

This case is about the freedom of Iowa churches to teach their religious beliefs, both to their congregants and the outside world, and to use their houses of worship consistently with those beliefs. For millennia, a central tenet of the Christian faith has been that God created two distinct, immutable, and complementary sexes—male and female—to reflect God's image and nature. From its founding, Plaintiff Fort Des Moines Church of Christ ("Church") not only taught this religious belief, but also ordered its facility to reflect and convey that belief. The Church could freely do so, until the Iowa Civil Rights Commission ("Commission") threatened those freedoms.

The Church discovered that the Commission—the entity responsible for interpreting and enforcing the Iowa Civil Rights Act, Iowa Code § 216.1, *et. seq* ("Act")—interprets that Act to ban churches from communicating their religious beliefs about the two distinct biological sexes and to require churches to open their showers and restrooms to members of the opposite sex. While the Act exempts "[a]ny bona fide religious institution with respect to any qualifications the institution may impose based on religion, sexual orientation, or gender identity when such qualifications are related to a bona fide religious purpose," the Commission interprets this exemption narrowly: to not cover churches when they open to the public. Iowa Code § 216.7(2)(a). This interpretation appears in the publication entitled "Sexual Orientation & Gender Identity: A Public Accommodations Provider's Guide to Iowa Law."[1] The publication begins in question and answer format and focuses on the right of individuals to access restrooms and showers "in accordance with their gender identity." The publication singles out one type of facility and asks: "Does this Law Apply to Churches?"  It answers the question as follows:

> *Sometimes*. Iowa law provides that these protections do not apply to religious institutions with respect to any religion-based qualifications when such

---

[1] This guide appears on the Commission's website at
https://icrc.iowa.gov/sites/default/files/publications/2012/SOGIPublicAccom.pdf, *last visited* July 11, 2016.

qualifications are related to a bona fide religious purpose. ***Where qualifications are not related to a bona fide religious purpose, churches are still subject to the law's provisions. (e.g. a child care facility operated at a church or a church service open to the public)***. (emphasis supplied.)

The Commission's interpretation of the Act requires churches to violate their religious beliefs in at least two ways: (1) they must refrain from communicating their religious beliefs about biological sex or in any way indicating that persons should use the sex-specific facility that accords with their biological sex, and (2) they must open church sex-specific, private areas like showers and restrooms to persons of the opposite biological sex. Iowa Code § 216.7(1)(a)-(b). The City of Des Moines enacted a nearly identical provision to Iowa Code § 216.7, likewise imposing these requirements on public accommodations. *See* Des Moines City Code Sec. 62-136 ("City Code").

After this lawsuit was filed, the Commission revised its guidance document. The Commission continued to single out places of worship for special instruction and to sanction churches that communicate their beliefs about biological sex, and operate their facilities consistent with those beliefs, when they engage in "non-religious activities."[2] The Commission does not define the newly-minted and vague term "non-religious activities," reserving to itself the unbridled discretion to determine for a church which of its activities are religious and which are not.

For the first time in our nation's history, state officials are reaching into the internal affairs of churches to silence them from teaching and publicly promoting a central tenet of their faith and forcing them to operate their own facilities in a way that contradicts their faith. This unprecedented overreach eviscerates the First Amendment and the foundational freedoms it embodies: the freedom of church autonomy, freedom to worship, freedom of speech, freedom of expressive association, and freedom to peaceably assemble without government interference. The Act's coercive demands directly and continually harm the Church's ability to teach its doctrines, to

---

[2] https://icrc.iowa.gov/sites/default/files/publications/2016/2016.sogi_.pa1_.pdf, *last viewed* July 11, 2016.

govern itself, and to follow its faith. The Church therefore needs a preliminary injunction to stop this ongoing irreparable harm and to bar the government from areas where it doesn't belong—the church's showers and restrooms, its sanctuary, and its pulpit.

**STATEMENT OF FACTS**[3]

**The Church's Religious Beliefs and Facility Policy**

The Church's motto, "Love God … Love People … Serve Everyone," encapsulates its mission to share with everyone the good news of forgiving grace in Jesus Christ. In furtherance of that mission, the Church holds weekly worship services, Bible studies, youth activities, and other religious events, and welcomes the public to attend its religious programming.

The Church holds to the historic Christian belief that God created two distinct, immutable, and complementary sexes, and that each person is created either male or female. The Church recognizes that some individuals are confused about their sexual identity, but believes that hope and peace are found in embracing the goodness of God's design in the distinct natures of maleness and femaleness. The Church proclaims these religious beliefs both to those who attend their services and to the public.

The Church also believes that its facility is a means by which it communicates and fulfills its mission. The Church has consecrated its church building as a house of worship and can only permit its facility to be used in furtherance of its religious principles: it cannot allow its facility to be used in a way that contradicts or dilutes its Christian message.

Because the Church believes that sex is an immutable trait from which springs a natural and healthy desire for physical privacy and modesty, it maintains two separate multi-occupancy restrooms: one for biological women, and one for biological men. The Church believes that it

---

[3] The following statement of facts is taken from Plaintiff's Verified Complaint, which is incorporated herein by reference.

would violate God's created order to permit these private spaces to be used by members of the opposite biological sex. For the entirety of its existence, the Church has maintained an unwritten policy—flowing logically from its biblically-informed beliefs—that these sensitive areas are to be used by the designated biological sex only.

**The Iowa Civil Rights Act, the Civil Rights Commission, and the City Code**

Until recently, the Church did not consider that it was necessary to make public its restroom and shower policy because the Church believed it was free to establish its own facility standards. The Church learned that the Iowa Civil Rights Commission interprets the Iowa Civil Rights Act to apply to churches. The Act makes it an unlawful discriminatory act for a public accommodation to:

a) "refuse or deny any person because of … gender identity … the accommodations, advantages, facilities, services, or privileges thereof…." Iowa Code § 216.7(1)(a) ("facility-use mandate").

b) "directly or indirectly advertise or in any other manner indicate or publicize that patronage of persons of any particular … gender identity … is unwelcome, objectionable, not acceptable or not solicited." Iowa Code § 216.7(1)(b) ("speech ban").

The Church resides within the city limits of Des Moines, Iowa, and the City enacted a nearly identical provision to Iowa Code § 216.7, likewise imposing these requirements on public accommodations. *See* Des Moines City Code Sec. 62-136. Collectively, both the Act and City Code provisions that ban public accommodations from restricting restroom and shower access because of gender identity will be referred to as the "facility-use mandate," and the Act and City Code provisions that ban statements indicating that persons are unwelcome because of gender identity will be referred to as the "speech ban."

Both the Act and City Code broadly define "public accommodation" to include private establishments when they offer services, facilities, or goods to nonmembers. *See* Iowa Code §

216.2(13)(a); Des Moines City Code § 62-1. Both of these laws purport to exempt "bona fide religious institutions" when they impose "qualifications … related to a bona fide religious purpose." Iowa Code § 216.7(2)(a); Des Moines City Code § 62-137(1) ("religious institution exemption"). That critical phrase, though, is not defined.

But the Commission issued a publication that interprets the religious institution exemption narrowly. The guide, entitled "Sexual Orientation & Gender Identity: A Public Accommodations Provider's Guide to Iowa Law,"[4] singles out one entity and poses the question, "Does This Law Apply to Churches?" The answer:

> *Sometimes*. Iowa law provides that these protections do not apply to religious institutions with respect to any religion-based qualifications when such qualifications are related to a bona fide religious purpose. *Where qualifications are not related to a bona fide religious purpose, churches are still subject to the law's provisions. (e.g. a child care facility operated at a church or a church service open to the public)*. (emphasis supplied.)

The guide goes on to state that it violates the facility-use mandate and speech ban to even *inquire* about an individual's gender identity in conjunction with that person's use of a sex-specific restroom, locker room, or shower area. The Iowa Civil Rights Commission has the power to interpret, administer, and enforce the Act; it has broad remedial powers, including, but not limited to, seeking monetary damages, legal fees, costs, and injunctive relief. *See id.* §§ 216.5, 216.15; *see also Rent-A-Center, Inc. v. Iowa Civil Rights Com'n*, 843 N.W.2d 727, 730 (Iowa 2014). While the Des Moines Civil and Human Rights Commission has not issued an interpretation of the nearly-identical City Code provision, it is reasonable to conclude the courts will give nearly identical phrases identical meaning. The City Commission likewise has the authority to seek damages, fees, costs and other remedial relief in its discretion. *See* Des Moines City Code § 62-42 and § 62-8.

---

[4] This guide is available on the Commission's website at
https://icrc.iowa.gov/sites/default/files/publications/2012/SOGIPublicAccom.pdf, *last visited* July 2, 2016.

**The Church's Desired Conduct and Chilled Speech**

Deeply concerned about the Act's and City Code's application to churches and the severe penalties for violating these laws, the Church has refrained from allowing its pastor to preach publicly about the Church's beliefs on biological sex and gender identity, even though the Church wants to do so. Attached to the Declaration of Pastor Michael Demastus, filed herewith, is the sermon he would deliver during a Sunday worship service to members and other attendees regarding the Church's beliefs concerning biological sex. He has not delivered the sermon because of the speech ban; any person claiming to feel "unwelcome" on account of gender identity could file a complaint with the Commission, or the Commission could initiate its own enforcement action, subjecting the Church to investigations, hearings, and substantial penalties.

The Church also took steps to formalize and publish its unwritten restroom and shower policy. The Church leadership team adopted a written policy to clearly set forth the Church's religious beliefs about biological sex and its facility use, which is attached to the Verified Complaint. It wants to include the policy on the church website, in the weekly bulletin, and through other means to ensure that the Church teaches and publicly conveys a consistent message regarding its religious beliefs about sexuality.[5] And because the Church loves and welcomes all people, it wants to clearly communicate its policy to avoid embarrassing or awkward situations for both those who identify as transgender and for its own members. But because the Commission interprets the Civil Rights Act to apply to churches, the Church fears publicizing or distributing this policy.

## ARGUMENT

The Church needs a preliminary injunction to avoid the imminent loss of constitutional rights. To obtain one, the Church must establish (1) a likelihood of success on the merits; (2)

---

[5] The written policy of the Church is attached to the Ver. Compl. as Ex. A.

irreparable harm; (3) that the balance of the harms are in its favor; and (4) that granting the injunction is in the public interest. *See Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,* 690 F.3d 996, 1000 (8th Cir. 2012). The Church satisfies this standard.

I.     **The Church Will Likely Succeed in Showing that the Act and City Code Violate the First and Fourteenth Amendments.**

The First and Fourteenth Amendments protect the Church's right to both communicate its doctrine and govern its affairs. But the Commission and its interpretation of Iowa Code §§ 216.2(13) and 216.7, and the City Code, chill the Church's speech and compels it to use its facilities in a way that violates its beliefs without a compelling government interest, violating both the Religion Clauses and the Free Speech Clause. Additionally, the speech ban (§ 216.7(1)(b)) is unconstitutionally overbroad, and both the speech ban and the religious institutions exemption (§ 216.7 (2)(a)) are unconstitutionally vague, infringing the Church's Due Process and Free Speech rights.[6]

**A. The facility-use mandate violates the Church's constitutional right to determine its religious beliefs about human sexuality, teach those beliefs to its members and to the public, and control its facility in a manner that is consistent with its religious beliefs without government interference.**

The Free Exercise and Establishment Clauses of the First Amendment protect the Church's right to communicate its faith. For that right to endure, the First Amendment shields the autonomy of the Church, free from government interference, to select its doctrine, teach its doctrine, determine with whom it shares its doctrine, and to administer its facilities in a manner consistent with its doctrine. The Church's religious beliefs regarding human sexuality and the manner in which it communicates those beliefs through its teaching and control of its facility are constitutionally-protected determinations.

---

[6] The Church raises additional claims in its complaint and reserves the right to pursue them in later filings.

The Free Exercise and Establishment Clauses guarantee houses of worship and other religious organizations the right to determine free from government intrusion, their own doctrine, polity, worship services, teaching, relationships with ministers and members, and other internal governance. *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952) (striking down a state law determining the use of a cathedral); *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985) (dismissing suit based on sexual and racial discrimination); *Hosanna-Tabor Evangelical Lutheran Church & Sch v EEOC*, 132 S.Ct 694, 711-12 (2012) ("When a minister who has been fired sues her church alleging that her termination was discriminatory, the First Amendment has struck the balance for us. The church must be free to choose those who will guide it on its way."). "The principles articulated in the church autonomy line of cases also apply to civil rights cases." *Bryce v. Episcopal Church in the Diocese of Colo.,* 289 F.3d 648, 656 (10th Cir. 2002). The First Amendment has long recognized "a private sphere within which religious bodies are free to govern themselves in accordance with their own [religious] beliefs." *Id.* at 712.

Indeed, the First Amendment—and especially the Religion Clauses—"radiat[e] ... a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff,* 344 U.S. at 116. Under the church autonomy doctrine, the threshold inquiry for the court is whether the actions complained of are "rooted in religious belief." *Bryce*, 289 F.3d 657. Protecting a church's right to express or communicate its faith necessarily includes preventing the government from interfering "in the way that the church wishes its doctrine to be expressed," otherwise the government may engage in improper "back-

door doctrinal determination[s]." *Menorah Chapels at Millburn v. Needle*, 899 A.2d 316, 321 (N.J. 2006).

The church autonomy doctrine applies to court decisions and legislative enactments alike. At issue in *Kedroff* was the validity of a state law determining the control of a cathedral.  *Kedroff*, 344 U.S. at 115. A New York state law required every Russian Orthodox church within the state to recognize as authoritative the decisions of the governing body of North American churches, instead of the supreme authority of the Russian Orthodox church in Moscow. The Court invalidated the law because the right to use the church building was strictly a matter of ecclesiastical government over which the state had no authority and was an intrusion into the "forbidden area of religious freedom contrary to the principles of the First Amendment." *Id*. at 119.

The U.S. Supreme Court's most recent pronouncement of the church autonomy principle dealt with the right of religious organizations to select their leaders, even when the government is enforcing nondiscrimination laws. *See Hosanna-Tabor*, 132 S.Ct. at 711-12. ("The First Amendment protects the freedom of religious groups to engage in certain key religious activities, including the … critical process of communicating the faith.") (Alito, J. and Kagan, J., concurring). The Court concluded that the Religion Clauses of the First Amendment protect a private sphere within which religious bodies are free to govern themselves without interference by the government even when enforcing its nondiscrimination laws. "Such action interferes with the internal governance of the church," how the church's beliefs will be personified, and the church's "right to shape its own faith and mission."  *Id.* at 706.

A house of worship embodies and furthers the religious expression of its congregants. Religion includes important communal elements for most believers, and they exercise their religion through religious organizations, churches being paramount:

> Determining that certain activities are in furtherance of an organization's religious mission …is thus a means by which a religious community defines itself. Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well.

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring).

The facility-use mandate clearly intrudes into the "forbidden area" of the Church's freedom to determine its worship services, how it communicates its faith, its doctrine, and the use of its facility in a manner consistent with and in the furtherance of that doctrine.  Specifically, the facility use mandate:

1. contradicts the Church's doctrine that when it offers services, facilities, or goods to nonmembers—even gratuitously, *see id.* § 216.2(13)(a)—like when it welcomes visitors to its worship services, youth activities,  or community events—it is engaged in a religious activity;

2. is predicated on the inherently religious, and therefore improper, judgment that a church's control of its facility is not reflective of the Church's ability to communicate its beliefs, govern itself, or determine its religious identity;

3. interferes with the Church's right to communicate its beliefs;

4. encroaches upon the authority of the Church's ecclesiastical government of its own affairs; and

5. coerces the Church to abandon its religious beliefs regarding human sexuality.

The Commission's failure to recognize that the facility-use mandate directly interferes with the Church's ecclesiastical authority to inculcate its faith illustrates the importance of the First Amendment's protection against "secular control or manipulation." *Kedroff,* 344 U.S at 116.

Iowa's enforcement of the facility-use mandate against churches implicates religious liberty interests similar to those threatened when the government interferes with the right of

religious organizations to choose their own religious leaders. *See Hosanna-Tabor,* 132 S.Ct. at 706.  As when the government attempts to enforce employment nondiscrimination laws in the selection of spiritual leaders, the facility-use mandate encroaches upon the Church's internal governance of its facility, how the Church's religious beliefs and teaching regarding sex will be embodied in the use of its own building, and the Church's right to shape its own faith and mission. *Id.*

Applying the facility-use mandate to houses of worship because they invite visitors to attend religious services and other events at the Church clearly misunderstands the unique and communal purpose of religious organizations, which embody and further the religious expression of their communities. The Church determined that its policy regarding access to its restrooms and showers should be consistent with its understanding of the Bible's teaching regarding the immutability and complementariness of the male and female sexes. This is a self-defining decision of the Church's religious community.

The facility-use mandate also violates the Establishment Clause because it empowers the Commission to force churches to change their religious-based policies regarding access to its showers and restrooms. The Establishment Clause prohibits government involvement in such ecclesiastical decisions. *See Hosanna-Tabor,* 132 S.Ct. at 706.  Even the risk of a government actor determining "whether an activity is religious or secular requires a searching case-by-case analysis" that results in "considerable ongoing government entanglement in religious affairs." *Amos*, 483 U.S. at 343.

The Act and the Commission's declaration that the facility-use mandate will be enforced against the Church, and other Iowa houses of worship, is a disturbing and unprecedented interference "with the internal governance of the church," how the church's beliefs will be

personified, and the church's "right to shape its own faith and mission." *Hosanna-Tabor*, 132 S.Ct, at 706. The facility-use mandate is unconstitutional and the Church can, therefore, demonstrate that it is likely to succeed on the merits of its Free Exercise and Establishment claims.

**B. The speech ban violates the Church's right to communicate its doctrine and control its facility use.**

The Church wants to communicate its beliefs concerning God's design for human sexuality in at least three mutually-reinforcing ways: teaching from the Bible, publishing its shower and restroom policy and explaining how it is consistent with that teaching, and posting the policy on its website and in the bulletin it distributes to all who attend its Sunday worship services to ensure that is policy is consistently observed. But the speech ban prohibits this constitutionally-protected speech in violation of the First Amendment.

**1. The speech ban regulates constitutionally-protected religious speech.**

The speech ban prohibits covered entities from "directly or indirectly advertis[ing] or in any other manner indicat[ing]" that "persons of any particular…gender identity" are "unwelcome, objectionable, not acceptable, or not solicited."  The speech ban is so broadly written that, when applied to the Church, it prohibits the Church from delivering the sermon regarding its biblical beliefs of human sexuality, discussing those beliefs in connection with its shower and restroom policy, and distributing that policy so that its beliefs are consistently followed by those who use its facility. As applied to the Church, the speech ban chills and prohibits religious speech. The Church wants to communicate its doctrine and its biblically-informed application of that doctrine. Private religious speech, "far from being a First Amendment orphan," enjoys full and robust protection under the Free Speech Clause. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

### 2.   The speech ban is content and viewpoint based.

"It is axiomatic that the government may not regulate speech based on its substantive content…." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). A law regulates content if it "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2227 (2015). Yet the speech ban does precisely this. It prohibits speech about certain topics (gender identity) and permits speech about other topics (helping the poor), tethering legality to the message expressed. The Commission cannot evaluate the Church's compliance with the speech ban without considering the idea or message it communicates— making the speech ban a textbook example of content-based restriction.

But not only is the speech ban a content-based restriction, it perpetrates a particularly "egregious form of content discrimination" called viewpoint discrimination. *Rosenberger*, 515 U.S. at 829. Viewpoint discrimination targets not only speech content, but the "particular views taken by speakers on a subject." *Id.* The Act's speech ban allows for this noxious discrimination: the Act permits speech that is perceived as "welcoming" and consistent with the Commission's views about gender identity, but proscribes speech that is perceived as "unwelcoming" or objectionable. *See* § 216.7(1)(b). This is classic viewpoint discrimination.

### 3.   The speech ban fails strict scrutiny.

Both content and viewpoint-based speech restrictions are presumptively unconstitutional. *See Reed*, 135 S.Ct. at 2226 ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional…."). The Commission cannot overcome this presumption by portraying the Church's speech as promoting an illegal activity banned under the facility-use mandate. As discussed above, the Church has a constitutional right to direct and control its facility in harmony with its religious beliefs. This includes establishing

standards for the use of sex-specific facilities. Communicating these standards, as the Church wants to do, is therefore lawful activity.

Thus, the Commission must justify its speech ban by proving that it is narrowly tailored to serve compelling state interests. *See Reed*, 135 S.Ct. at 2226. It cannot meet this standard. The Commission has no compelling interest in censoring religious messages or ideas—especially those doctrinal beliefs expressed within a house of worship. The Church's religious beliefs are fundamental to their understanding of the Bible's teaching regarding the immutability and complementariness of sex. Their beliefs are hardly new. The founder of their faith, Jesus Christ, taught in Matthew 19:4: "Haven't you read … that at the beginning the Creator 'made them male and female."

Nor can the Commission justify its goal by trying to shelter people from ideas they may find disagreeable. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Furthermore, the speech ban lacks narrow tailoring. It does not merely ban words declining to admit persons to accommodations or facilities, but it also bans communications that "in any other manner indicate" that someone would be "unwelcome, objectionable, not acceptable, or not solicited" based on protected characteristics. Any criticism of a group or ideas associated with a group could imply that group is unwelcome. This sweeps in a substantial amount of constitutionally-protected expression, as discussed in greater detail below regarding overbreadth. Thus, the Commission cannot satisfy strict scrutiny. Its content and viewpoint-based speech restrictions are unconstitutional and the Church can therefore demonstrate that it is likely to succeed on the merits of its Free Speech claim.

**C. The religious institution exemption and speech ban are unconstitutionally vague in violation of the Fourteenth Amendment.**

While the Commission has clearly interpreted the Act to apply to churches, the Act's imprecise language opens the door to this and numerous other interpretations, rendering it unconstitutionally vague. Vague, imprecise laws violate the Fourteenth Amendment Due Process guarantee by "fail[ing] to provide the kind of notice that will enable ordinary people to understand what conduct [the law] prohibits…." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *see also Woodis v. Westark Community College*, 160 F.3d 435, 438 (8th Cir. 1998) ("The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments.").

"[W]hen First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998). Laws that interfere with free speech are subject to more exacting scrutiny and require greater definiteness than other contexts. *See Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689-90 (8th Cir. 1992) ("A stringent vagueness test applies to a law that interferes with the right of free speech"); *see also Woodis,* 160 F.3d at 438 ("In a facial vagueness challenge, an enactment reaching a substantial amount of constitutionally protected conduct may withstand constitutional scrutiny only if it incorporates a high level of definiteness."). And for good reason. In the face of vague laws, citizens voluntarily curtail their First Amendment activities because they fear that those activities could be characterized as illegal. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). The Church, for example, has self-censored not only its speech about how its facilities are to be used, but has also self-censored what its church leaders preach from the pulpit.

The Act is vague in two respects. First, the "bona fide religious purpose" exemption is vague as-applied because it lacks any clear definition. The facility-use mandate and speech ban in

Section 216.7(1) do not apply to "religious organizations" as defined by the religious institutions exemption: "[a]ny bona fide religious institution with respect to any qualifications the institution may impose based on religion, sexual orientation, or gender identity when such qualifications are related to a bona fide religious purpose." Iowa Code § 216.7(2)(a) The Act fails to define a "bona fide religious purpose." The surrounding statute offers no narrowing context and neither the Commission nor Iowa courts have yet to interpret this term of art. "[W]ithout statutory definitions, narrowing context, or settled legal meanings," persons of ordinary intelligence—including the Church—are left to speculate about what qualifies as a bona fide religious purpose. *U.S. v. Williams*, 553 U.S. 285, 306 (2008).

Such persons might reasonably assume that—at a minimum—church activities would qualify as a "bona fide religious purpose." But not according to the Commission. Astonishingly, the Commission's  official guidance stating that churches must comply with the Act when their activities are *not* related to a bona fide religious purpose, concludes that a "church service open to the public" is not a bona fide religious purpose.

 After the Church commenced this lawsuit, on July 8, 2016 the Commission issued a press release and revision to its guide: "Sexual Orientation & Gender Identity: A Public Accommodations Provider's Guide to Iowa Law."[7]  The guide continues to single out houses of worship for special instruction and offers a new interpretation of the religious institution exemption:

> Places of worship (e.g. churches, synagogues, mosques, etc.) are **generally exempt** from the Iowa law's prohibition of discrimination**, unless the place of worship engages in non-religious activities which are open to the public**. For example, the law may apply to an independent day care or polling place located on the premises of the place of worship.[8] (emphasis supplied.)

---

[7] https://icrc.iowa.gov/pressrelease/iowa-civil-rights-commission-releases-revised-sexual-orientation-gender-identity-public, *last viewed* July 11, 2016.
[8] https://icrc.iowa.gov/sites/default/files/publications/2016/2016.sogi_.pa1_.pdf, *last viewed* July 11, 2016.

But the Commission's revisions only serve to highlight the vagueness and imprecision of the exemption and leave the door wide-open to numerous (additional) interpretations.  What does the Commission consider to be "non-religious activities?" What standard or analytical tool will it employ so that churches may anticipate and avoid Commission intervention and liability? No Commission rule defines the newly-minted term. Persons of ordinary intelligence are left to speculate about what qualifies as a "non-religious activity." *U.S. v. Williams*, 553 U.S. at 306.

Second, the speech ban is also vague, both facially and as-applied. Section § 216.7(1)(b) makes it a discriminatory practice "[t]o directly or indirectly advertise or in any other manner indicate or publicize that the patronage of persons…is unwelcome, objectionable, not acceptable, or not solicited." The terms "in any other manner indicate," and "unwelcome, objectionable, not acceptable, or not solicited" are not defined by statute, context, or settled legal meaning. Unmoored from objective definition, the phrase to "in any other manner indicate" appears to encompass expression ranging from pure speech (like a sermon, posting signs, and verbal speech) to expressive conduct (like shaking one's head). And identifying "unwelcome" or "objectionable" speech is a subjective judgment wholly determined by the hearer's interpretation of the speech, not a clear objective standard.  Even a pastor's sermon addressing God's design for human sexuality could be interpreted as "unwelcome." The plausible interpretations of these vagaries are nearly boundless, especially since the Act must be construed broadly.

Without clear definitions of a "bona fide religious purpose," what it means to "in any other manner indicate," and what statements are "unwelcome, objectionable, not acceptable or not solicited," the statute lacks any narrowly drawn, reasonably definite standard for identifying what expression and conduct it prohibits. People of ordinary intelligence—pastors or Commissioners— must guess at the statute's meaning.

As a result, the statute is impermissibly vague and thereby unconstitutional on due process grounds. A preliminary injunction is necessary to stop the chilling effect both on the Church and on other non-parties not before this Court. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801 (noting that the purpose of facial challenges for overbreadth and vagueness is to prevent any chilling effect that imprecise or overly inclusive rules may have on the exercise of protected speech by non-parties.).

### D. The speech ban is unconstitutionally overbroad in violation of the First Amendment.

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). The speech ban is unconstitutionally overbroad on its face because it sweeps within its ambit a substantial amount of constitutionally-protected expression. *See Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 685 (8th Cir. 2012) ("An ordinance may also be invalidated on a facial First Amendment challenge as overbroad if a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep.").

According to the Act and the Commission's interpretation, both the facility-use mandate and the speech ban apply to the Church when it is not engaged in a "bona fide religious purpose," such as when it holds church services or other events open to the public. This interpretation of the Act sweeps within its ambit private religious speech that occurs before, during, and after worship services and all other religious programming. This language not only prohibits the Church from teaching about God's design for human sexuality, and publishing its restroom and shower policy, but it also appears to prohibit Church leaders from even responding with a negative answer to questions about shower and restroom access.

Furthermore, the speech ban is substantially similar to speech codes that have been struck down as overbroad because they too chilled free expression by "inhibiting the speech of third parties who are not before the court. *See Saxe v. State College Area Sch. Dist.*, 240 F.3d. 200, 215 (3rd Cir. 2001) (invalidating school policy that banned "any unwelcome verbal … conduct which offends … because of" protected characteristics); *Armstrong v. Dist. of Columbia Pub. Library*, 154 F.Supp.2d 67, 78-79 (D.D.C. 2001) (invalidating a regulation denying library access to patrons with "objectionable appearance").

As discussed above, the Church has the First Amendment right to control its doctrine, beliefs, worship services, operations, polity, and facility in harmony with its religious beliefs. This includes establishing standards for the use of sex-specific facilities. Communicating these standards, as the Church wants to do, is therefore lawful activity.

## II.     The Church is Suffering Irreparable Harm.

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc). The Iowa Civil Rights Commission represses the Church's freedom to communicate its beliefs and tramples on its freedom to use its facility consistent with its faith. That harm is ongoing and irreparable. Fearing reprisal, the Church chills and self-censors its speech. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Powell v. Noble,* 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality)). Only injunctive relief can stop further harm to the Church's First and Fourteenth Amendment rights.

**III.     The Balance of Hardships Favors the Church.**

Without an injunction, the Church continues to lose its free speech, free exercise, and due process rights. With an injunction, the Commission loses nothing because "the Government does not have an interest in the enforcement of an unconstitutional law." *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003). Thus, the balance of hardships favors the Church.

**IV.     Public Policy Favors a Preliminary Injunction For the Church.**

Finally, it is axiomatic that protection of First Amendment rights serves the public interest. *See Minn. Citizens Concerned for Life,* 692 F.3d at 870. The public benefits when churches, like Fort Des Moines Church of Christ, can continue communicating their message of hope and redemption in Jesus Christ, and welcoming all to enter and observe those beliefs reflected consistently in everything from the pulpit, to the pew, to the use of its facility.

## <u>CONCLUSION</u>

The church is not a sandwich shop. While the government has more leeway to regulate the latter, that leeway stops at the church door. To accomplish its religious mission—the proclamation and inculcation of religious doctrine—the church must have the autonomy to choose its beliefs, teach those beliefs, and operate by those beliefs. The Commission has now bulldozed that autonomy and deterred the Church from teaching and operating by its religious beliefs. The Church therefore asks this Court for a preliminary injunction to stop this ongoing constitutional harm and to restore its control over its showers and restrooms, its sanctuary, and its pulpit.

Dated:  July 13, 2016

Respectfully submitted,

/s/ Steven O'Ban
Steven O'Ban*
Erik Stanley*
Jeremy Tedesco*
ALLIANCE DEFENDING FREEDOM
15100 N 90th St
Scottsdale, AZ 85260
Tel.:  480-444-0020
Fax:  480-444-0028
soban@ADFlegal.org

Christiana Holcomb*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Tel.:  202-393-8690
*Not licensed in DC*
*Practice limited to federal court*

Timm Reid
300 Walnut St Suite 5
Des Moines, IA 50309
Tel.: 800-217-9312
TReid@galliganlaw.com


*Attorneys for Plaintiff*


*\*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Date: July 13, 2016

/s/ Steven O'Ban
Steven O'Ban